**E-FILED**
Tuesday, 23 February, 2016  08:52:34 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DOUGLAS D. HARMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3258 |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Douglas Devon Harmon appeals from the denial of his application for Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Harmon has filed Plaintiff's Memorandum in Support of Summary Judgment or Remand (d/e 10) (Plaintiff's Memorandum), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 13).  The matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be AFFIRMED.

## STATEMENT OF FACTS

Harmon was born on April 17, 1970.  Harmon applied for SSI on July 5, 2011.  Harmon previously worked as a fast food cook, a day care worker, a car sales person, and a temporary assembly line manager. Harmon completed high school and some college coursework.  Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.), 31-33, 50.  He suffered from lumbar degenerative disc disease, cardiomyopathy, obesity, affective disorder, anxiety disorder, and history of polysubstance abuse and/or dependence.  R. 12.

On February 17, 2011, Harmon was brought to the emergency room at St. John's Hospital in Springfield, Illinois, where he reported taking 33 Tylenol PM in a suicide attempt.  R. 205-26.  Harmon indicated he felt depressed and was experiencing poor sleep.  He related using six hundred dollars ($600.00) worth of cocaine the day before.  He stated that he had been sober for three years before this incident.  Tests indicated that Harmon had not ingested the Tylenol PM.  Medical staff suspected that Harmon may have been seeking attention from his girlfriend.  He was not admitted to the hospital.  He was assessed with adjustment disorder versus

depressive disorder.  He was given a Global Assessment of Functioning (GAF) score of 45-50.[1]  R. 223, 225.

On June 22, 2011, Harmon underwent an MRI of his lumbar spine. Dr. Sheila Ayorinde, M.D., ordered the MRI.  The MRI showed multi-level degenerative changes including severe left neuroforaminal stenosis at L5-S1 and mild left neuroforaminal stenosis at L4-L5.  R. 203-04.

On July 15, 2011, Harmon saw Physician's Assistant Jacob Monsivais, PA, in Dr. Ayorinde's office for a follow-up.  R. 315-19.  Harmon reported severe back pain.  Harmon stated that he could only stand for a couple of hours a day.  Harmon stated that he needed to lie down due to the pain.  Harmon reported that the pain radiated to his left thigh, calf, and foot.  Harmon reported that he may have some numbness in his feet due to his diabetes. On examination, Monsivais found discomfort to palpitation of the lumbar region.  Straight leg testing was positive bilaterally.  Monsivais observed normal coordination, normal gait, and normal muscle strength and tone throughout his extremities.  Monsivais assessed spondylolisthesis, low back pain, and lumbar radiculopathy.  R. 317-19.

---

[1] The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness.  American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) at 32-35.  The American Psychiatric Association no longer recommends use of the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

On August 5, 2011, Harmon's mother, Jessie Madison, completed a Function Report—Adult—Third Party form.  R. 124-31.  Madison reported that Harmon was unable to lift items that he could lift in the past.  Madison reported that Harmon spent his days reading, watching television, and babysitting.  She reported that Harmon fixed meals.  She reported that he had difficulty sleeping some times.  R. 125.  Madison reported that Harmon did laundry and household cleaning.  R. 126.  Madison reported that Harmon had difficulty completing simple tasks.  She reported that he could lift 25 pounds, could walk 1/8 mile before he needed to stop and rest for five minutes, and had problems squatting, bending, reaching, walking, sitting, and kneeling.  R. 129.  Madison reported that Harmon could understand and follow written or spoken instructions, and he got along well with authority figures.  R. 129-30.

On August 8, 2011, Harmon prepared a Function Report—Adult form. R. 140-47.  Harmon reported that he was in constant pain "whether sitting or standing."  R. 140.  Harmon reported that he spent his time on the Internet, reading, or listening to music.  He reported that he left the house only to go grocery shopping, NA meetings, or to go to the doctor.[2]  R. 141, 144.  Harmon reported that his pain kept him up at night.  As a result he

---

[2] NA stands for Narcotics Anonymous.

reported, "I find myself sleeping across the day."  R. 141.  Harmon reported that he needed help dressing and bathing when his pain was severe.  He also sometimes needed help getting up from the toilet.  R. 141.  Harmon reported that he used a microwave oven to heat prepared meals.  He otherwise rarely cooked.  R. 142.  Harmon reported that he did not do housework or yard work due to his back and leg pain.  R. 143.  Harmon went grocery shopping twice a month.  He did not go out alone because he sometimes fell.  R. 143.  Harmon reported that he could walk twenty to thirty feet and carry a few pounds.  He could pay attention and could follow instructions.  He also got along with authority figures well.  R. 145-46.  Harmon reported that he used a cane to walk.  R. 146.

On August 25, 2011, Harmon underwent nerve conduction and EMG studies in the lumbar region.  R. 340-41.  Dr. Zeng Y Wang M.D., Ph.D., performed the studies.  Monsivais referred Harmon for the studies.  The tests showed mild bilateral lumbosacral radiculopathy of the nerve roots of L5 and S1 and mild denervation and reinnervation of the L5 and S1 innervated muscles, as well as the lumbosacral paraspinal muscles.  Dr. Wang noted that Harmon had a very low pain tolerance.  R. 341.

On September 23, 2011, Harmon saw state agency physician Dr. Vittal Chapa for a consultative examination.  R. 259-61.  Harmon reported lower back pain.  Harmon put his pain at a 6 on a scale of 1 to 10.  R. 259.  Dr. Chapa noted that Harmon probably needed a cane to walk.  Without the cane, Harmon walked about five steps and then held onto the walls for support.  R. 260.  On examination, Harmon's left knee reflex was absent and his right knee reflex was 1+.  Dr. Chapa noted no joint redness but moderate paravertebral muscle spasms.  Straight leg testing was positive at fifty degrees bilaterally.  Dr. Chapa assessed chronic lumbosacral pain syndrome.  R. 261.

On October 5, 2011, Harmon saw state agency psychologist Dr. Delores Trello, Psy.D., for a consultative mental status examination.  R. 263-67.  Harmon reported suffering from depression on and off for years.  Harmon reported that he was a recovering addict.  Harmon reported that he had been sober for eight months.  Harmon reported difficulty sleeping due to back pain.  He reported crying episodes and a history of suicidal ideation, panic attacks, and worry about finances.  R. 264.  Dr. Trello assessed depression with panic attacks and agoraphobia.  Dr. Trello assigned Harmon a GAF score of 50.  R. 266.

On October 21, 2011, state agency physician Dr. Elizabeth Kuester, M.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Harmon.  R. 268-83.  Dr. Kuester opined that Harmon suffered from an affective disorder of depression, an anxiety-related disorder, and a substance addiction disorder.  R. 268. Dr. Kuester opined that as a result of these disorders, Harmon had mild limitations on activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence or pace; and had not experienced any episodes of decompensation.  R. 278.  Dr. Kuester further opined that Harmon had moderate limitations in his ability to carry out detailed instructions and to maintain attention and concentration for extended periods.  R. 281.  Dr. Kuester opined that Harmon also would have moderate difficulties in completing a normal workweek and moderate limitations in his ability to interact appropriately with the general public. R. 282.  Dr. Kuester opined that Harmon would have difficulty performing complex tasks, but could perform simple, routine tasks adequately.  R. 283.

On November 3, 2011, state agency physician Dr. Marion Panepinto, M.D., prepared a Physical Residual Functional Capacity Assessment of Harmon.  R. 284-91.  Dr. Panepinto opined that Harmon could lift ten pounds occasionally and less than ten pounds frequently; could stand

and/or walk for two hours in an eight-hour workday; could sit for six hours in an eight-hour workday; could never climb ropes or ladders; could occasionally climb stairs and ramps; and could occasionally balance, stoop, kneel, crouch, and crawl. Dr. Panepinto noted no other physical functional limitations. R. 285-88. Dr. Panepinto opined that Harmon's claims about his functional limitations were partially credible. R. 289.

On August 17, 2012, Harmon saw Dr. Ayorinde's Nurse Practitioner Jazzcelyn Loleng, FNP. Harmon was 5 feet 11 inches tall and weighed 243 pounds. R. 362. Harmon denied loss of grip strength. He reported that his exercise included walking. R. 361. He denied chest pain, anxiety, depression, gait disturbance, memory impairment, and numbness in extremities, back pain, joint pain, and muscle weakness. His memory was intact and he had an appropriate mood and affect. R. 362-63.

On February 13, 2013, Harmon went to the emergency room at St. John's Hospital in Springfield, Illinois, with shortness of breath, cough, and chest pain. Harmon had a history of a heart condition in which he had a left ventricular ejection fraction of 45%. A CT scan of his chest suggested congestive heart failure. R. 366. He was admitted and stayed at the hospital until February 16, 2013. A cardiolite stress test showed evidence of cardiomyopathy, moderate fixed inferior wall defect and mild fixed lateral

wall defects without evidence of reversible ischemia.  The left ventricular ejection fraction was between 20% and 30%.  R. 365.  The discharge diagnosis was hypertensive urgency, cardiomyopathy with an ejection fraction of 22%, acute systolic congestive heart failure, acute or chronic renal failure, non-ST myocardial infarction, and type II diabetes mellitus. He was discharged with a Life Vest automatic defibrillator.  R. 365.

On February 15, 2013, Dr. Kreigh P. Moulton, M.D., performed a cardiac consultation on Harmon during his hospitalization.  Dr. Moulton ordered the Life Vest for Harmon.  Dr. Moulton stated that if after three months Harmon's ejection fraction remained below 35 %, he would recommend surgery to implant a defibrillator into Harmon.  Dr. Moulton stated that if the ejection fraction improved above 35%, "he can turn in the Life Vest and will not require a defibrillator."  R. 439.

On February 20, 2013, Harmon saw Dr. Ayorinde.  R. 356-59. Harmon weighed 252 pounds.  Dr. Ayorinde assessed hypertension, sleep apnea and obesity.  R. 356.  On March 6, 2013, Harmon saw Dr. Ayorinde.   Harmon weighed 240 pounds.  Harmon reported shortness of breath and fatigue, but no chest pain.  Harmon rated his pain at 4 out of 10.  R. 353-54.

On March 13, 2013, Harmon completed another Function Report—Adult form.  R. 160-67.  He reported shortness of breath from heart problems and inability to be on his feet for any length of time.  Harmon reported that his sleep was broken up.  He reported that he needed help to bathe and sometimes to dress himself.  He also needed help getting down and up at the toilet.  He stated that most of the time he was bed ridden.  R. 161.    He rarely cooked.  He sat next to the stove when he cooked.  He reported that he did light housework and laundry in spurts for two to four hours when he was able.  R. 162.  He spent his days watching television, reading, and playing video games.  He went shopping once or twice a month.  R. 163-64.  He also went to church and NA meetings, but his "attendance has dramatically decreased."  R. 164.  Harmon stated that he could lift forty to fifty pounds, walk forty to fifty feet, and could not "squat, stand, reach, walk, sit kneel, stair climb . . . for any consistent amount of time."  He reported that some of these functions "I can't do at all."  R. 165.  Harmon concluded:

> I will just like to add I have other ailments (illnesses) that affect my ability to maintain a regular 9 to 5.  Issues with my heart, and also depression.  I have been dealing with these for years.  Because of my high medical debts most times I refuse to go to the hospital so I'm usually bed ridden sometimes for a couple of days at a time.

R. 167.

On April 25, 2013, the Administrative Law Judge (ALJ) conducted a hearing.  R. 27-53.  The ALJ conducted the hearing in Peoria, Illinois.  Harmon appeared with his attorney via video conference from Springfield, Illinois.  Vocational expert Bob Hammond also appeared at the hearing.  R. 10, 29.

Harmon testified first.  He testified that he was 5 feet 11 inches tall and weighed 231.5 pounds.  He lived with his girlfriend and his girlfriend's 5 year-old grandson.  R. 32, 42.  Harmon testified that he previously worked as an assembly line manager, a warehouse laborer, a restaurant worker, and a day care worker.  He quit the restaurant job because he could no longer change the grease in the fryers due to his back pain.  R. 34-35.

Harmon testified that he started having back problems in 1991.  Harmon testified that he did not get any injections for his back because he was a recovering addict.  Harmon testified that he took naproxen for some time, but stopped because it was causing liver and kidney problems.  R. 36.  Harmon testified, "I usually just lay there and suffer through it.  I'm just so leery with the recovery."  R. 36. Harmon testified that his back hurt all the time.  Harmon testified that he had shooting pain in his legs.  He testified that a doctor prescribed a cane to walk about two to three years before the

hearing.  R. 37.  Harmon testified that he fell several times before he started using the cane.  R. 41.

Harmon testified that he was wearing a defibrillator at the hearing, called a Life Vest.  R. 44.  He testified that if the machine detected an abnormal reading it automatically shocked the wearer.  R. 45-46.  He testified that he was in the process of being evaluated for a surgical procedure to implant a defibrillator.  He testified that the doctor told him, "[A]t some point something will have to be done.  It's either that or wheelchair."  R. 37-38.  Harmon testified that he had "a lot of fatigue" since leaving the hospital in February 2013.  Harmon testified that he was previously diagnosed with a heart problem when he was actively abusing drugs.  Harmon testified that he was scheduled to undergo further testing on his heart.  R. 39.

Harmon testified that he has been sober for six years, except for the one-time relapse in 2011.  Harmon testified that he was taking Prozac for depression.  He testified that the Prozac was effective.  R. 40.

Harmon testified that since his heart problem he has been unable to do anything.  He testified that he previously walked around his complex with a cane.  He testified that he could not help his girlfriend's grandson

learn to ride a bike.  R. 40.  The ALJ asked Harmon what he could do

before his recent heart problems.  Harmon testified,

> Within the last 5-6 years, I used to be able to stand 4-5 hours
> before it would start messing with me.  Now, it doesn't take but
> 15-20 minutes and it's pushing it.  My legs get to (sic) shaking.
> That's current.  I don't even go out and eat because that's what
> I used to like to do.

R. 40.  Harmon testified that his fatigue had been going on for months

before he went to the hospital in February 2013.  Harmon testified that six

to eight months earlier he started having trouble walking to his mailbox

without stopping to rest several times.  R. 43.

Harmon testified that his medications helped his condition since the

February 2013 hospitalization.  Harmon testified that he still felt fatigued,

but he could do more.  He could sit up.  R. 44-45.

Harmon testified that his ability to sit depended on the type of chair.

Harmon testified that he also had pain lying down.  He testified that his

girlfriend gave him massages daily.  R. 40-41.  He testified that he had

some problems tying his shoes.  He also testified that he held onto railings

to take a shower.   R. 41-42.

Harmon testified that he thought he could perform a job in which he

sat six to eight hours in an eight-hour workday if he sat in a chair like the

one he was sitting in at the time of the hearing.  He said he could do such a

job, "As long as I can stretch and get into a different position."  R. 47.

Harmon testified that he could not say whether he would need to lie down

during an eight-hour workday.  He testified that for the last year he has

been unable to go eight hours without lying down.  R. 47.

Harmon testified that in a typical day, he got up sometime between

5:00 a.m. and 7:00 a.m.  By 9:00 to 10:00 a.m., Harmon testified that he

would be in "the lay-down position" for at least an hour or two.  Harmon

testified that he needed to lie down for another hour or two later in the day

before 5:00 p.m.  R. 47-48.

Harmon testified that he used a computer to play Internet chess and

to pay bills.  He testified that he played chess on a laptop computer while

lying down in bed.  T. 48.  He did not do household chores.  Harmon made

lunch for the grandson sometimes.  He and the grandson also read and

played with puzzles together.  R. 42.

Harmon concluded his testimony with this statement:

> My main thing is my medicine.  It I could get my medicine
> a lot of this depression and stuff that I experience from trying to
> take the amount of income I've got, I have to make decisions
> like do I want to pay electric and it's real hard especially with
> this congenital.
>
> I can't shop at Aldi's anymore.  I have to go to Shop &
> Save because I have to get Smart Balance.  I can't buy Country
> Crock.  Everything to maintain my health is expensive to do.

R. 49.[3]

Vocational expert Hammond then testified.  Hammond classified

Harmon's prior work as fast food cook, day care worker, car sales, and

temporary employee.  R. 50.  The ALJ then asked Hammond:

> Please assume an individual that same age, education and work experience as the claimant limited to sedentary. Lift/carry/push/pull 10 pounds occasionally, less than 10 frequently.  Stand/walk two hours, sit six in an eight-hour workday.
>
> Handheld assistive device is necessary for ambulation. No ladder, ropes, scaffolds.  Occasional ramps, stairs, stoop, kneel, balance, crouch and crawl.  Understand detailed instructions, maintain attention and concentration for extended periods and complete a normal eight-hour workday without interruption from psychologically-based symptoms all rated as moderately limited.
>
> He would have difficulty sustaining the concentration and effort required by complex tasks.  He's limited to perform no more than simple, routine or repetitive tasks on a sustained basis with normal breaks.
>
> His ability to interact with the general public appropriately is rated as moderately limited.  Considering his impairments, I would like you to assume he's limited to no more than accessional contact with the general public.  Can this hypothetical individual do the past work of the claimant?

R. 50-51.  Hammond opined that such a person could not perform

Harmon's past relevant work.  R. 51.

---

[3] The court reporter typed the word "among" instead of "amount" in the third line of the quotation.  From the context, the Court believes Harmon used the word "amount."  The court reporter also spelled Aldi's as "Aldie's."  The Court corrected the spelling.

Hammond opined that such a person could perform other jobs, such as circuit board screener, with 2,800 such jobs in existence locally and 200,000 nationally; eyewear assembler, with 2,500 such jobs in existence locally and 96,000 nationally; and semi-conductor bonder, with 3,000 such jobs in existence locally and 115,000 nationally.  R. 51.  Hammond opined that such a person could perform these jobs even if he had to have the opportunity to alternate between sitting and standing.  R. 52.  Hammond opined that the person in the hypothetical question could not work if he had to lie down twice a day for at least thirty minutes each time.  R. 52.

At the conclusion of the hearing, the ALJ stated that he wanted to see the results of Harmon's scheduled cardiac testing.  R. 52.

On May 20, 2013, Harmon underwent an angiogram.  The test showed Harmon's left ventricular ejection fraction was 45% with some mild to moderate left ventricular systolic function impairment, no right impairment and some wall abnormalities  that could be suggestive of coronary artery disease.  R. 432-33.

On June 24, 2013, Harmon's attorney submitted Harmon's treatment records from February to May 2013 to the ALJ.  R. 426.

## DECISION OF THE ALJ

On July 18, 2013, the ALJ issued his decision.  R. 10-22.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),
404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of
presenting evidence and proving the issues on the first four steps.  The
Commissioner has the burden on the last step; the Commissioner must
show that, considering the listed factors, the claimant can perform some
type of gainful employment that exists in the national economy.  20 C.F.R.
§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th
Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir.
2005).

The ALJ also considered the relevant time frame for determining
eligibility for SSI benefits.  A claimant may be entitled to SSI benefits
regardless of work history or dates of insurance; however, he may only be
eligible to receive benefits commencing on the date he applied for SSI
benefits.  20 C.F.R. § 416.335.  Harmon applied for SSI benefits on July 5,
2011.  R. 11.

The ALJ found that Harmon met his burden at Steps 1 and 2.
Harmon had not been employed since July 5, 2011, and he suffered from
the severe impairments of lumbar degenerative disc disease,
cardiomyopathy, obesity, affective disorder, anxiety disorder, and history of
polysubstance abuse and/or dependence.  R. 12.

The ALJ found at Step 3 that Harmon's impairments or combination of impairments did not meet or equal a Listing.  The ALJ considered Listings 1.04 and 4.02, for disorders of the spine and chronic heart failure.  R. 13.  The ALJ found that Harmon's condition did not meet or equal either of these Listings.  R. 13.  The ALJ also considered the impact of Harmon's obesity in evaluating whether he met either Listing.  The ALJ concluded, "The evidence fails to establish that the additional impact of the claimant's excess weight would cause any relevant listing to be met or medically equaled."  R. 13.

The ALJ also considered Listings 12.04, 12.06, and 12.09, for affective disorders, anxiety-related disorders, and substance addiction disorders.  The ALJ found that Harmon had only mild restrictions on activities of daily living and moderate limitations in social functioning and the ability to maintain concentration, persistence or pace.  The ALJ found no evidence of decompensation.  R. 14.  Such findings did not meet the requirements of any of these Listings.

At Step 4, the ALJ found that Harmon had the following RFC:

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift, carry, push, and/or pull up to ten pounds occasionally and less than ten pounds frequently.  He can stand and/or walk for at least two hours, and sit for about six hours in a typical eight-hour workday.  A hand-held assistive

device is necessary for ambulation.  He can never climb ladders, ropes, or scaffolding.  He can climb ramps and/or stairs, balance, stoop, kneel, crouch, and crawl no more than occasionally.  He must have the opportunity to alternate between sitting and standing at least once every hour for at least five minutes at a time.  He would have difficulty sustaining the concentration and effort required by complex tasks, and he is limited to performing no more than simple, routine, and repetitive tasks on a sustained basis with only routine breaks.  Considering his impairments, he is limited to no more than occasional contact with the general public.

R. 15-16.  The ALJ relied on the July 2011 visit with Monsivais; Dr. Chapa's October 2011 examination; and the August 2012 examination with Loleng.  All these examinations showed normal strength generally, although Dr. Chapa noted that he needed a cane to ambulate.  The ALJ also relied on Dr. Moulton's February 2013 cardiac consultation note and the May 2013 angiogram that showed improvement with his heart since the February 2013 hospitalization.  The ALJ also relied on the opinions of Drs. Panepinto and Kuester.  The ALJ also relied on Dr. Trello's October 2011 examination and Harmon's limited history of treatment of mental problems.  The ALJ found that the medical evidence overall supported a finding that Harmon could perform the limited range of sedentary work described in the RFC.  The ALJ found that Harmon's claims to the contrary was not credible.  The ALJ also noted that Harmon testified that he could work a

sedentary job in which he sat six to eight hours if he could move around. R. 20.

The ALJ decided at Step 4 the Harmon could not perform his prior relevant work.  The ALJ relied on the RFC finding and Hammond's opinions.  R. 20.

At Step 5, the ALJ found that Harmon could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P Appendix 2, and Hammond's opinion testimony that a person with Harmon's age, experience, education, and RFC could perform the jobs of circuit board screener, eyewear assembler, and semi-conductor bonder.  R. 21.  The ALJ concluded that Harmon was not disabled.  R. 22.

Harmon appealed the ALJ's decision.  On July 15, 2014, the Appeals Council denied Harmon's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Harmon then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally his analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his

conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

    In this case the ALJ's decision was supported by substantial

evidence.  At Step 3, the evidence showed that Harmon's condition did not

meet any relevant Listings.  The ALJ specifically stated that he considered

Harmon's obesity and determined that his obesity did not cause his

condition to meet or equal a Listing.  The RFC determination was

supported by Dr. Chapa's examination; Dr. Panepinto's opinion; Dr. Trello's

examination; Dr. Keuster's opinions; the medical records from his visits to

FNP Loleng and to PA Monsivais; the May 2013 angiogram that showed

improvement in his heart condition that Dr. Moulton indicated was material;

and Harmon's testimony at the hearing that he could work a job in which he

sat for six to eight hours a day.  The determination at Step 5 that Harmon

could perform a significant number of jobs in the national economy was

supported by the RFC determination and the opinions of vocational expert

Hammond.  The ALJ's decision was supported by substantial evidence.

Harmon asserts in his memorandum that the ALJ erred in failing to

find that his condition medically equaled a Listing.  Plaintiff's Memorandum,

at 9.  The argument is made in a cursory and summary fashion.  Harmon

does not argue that Harmon met a Listing.  Harmon also does not identify

any Listing that his condition medically equaled.  The failure to develop this

argument effectively waives the argument.  See United States v. Dunkel,

927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("A skeletal 'argument', really

nothing more than an assertion, does not preserve a claim.").  Moreover,

the ALJ carefully considered the relevant Listings, and the impact of

Harmon's obesity on his impairments.  R. 13-15.  The ALJ's decision that

Harmon's condition did not meet or equal any of those Listings is fully

supported by the medical and psychological evidence in the record.  The

Court sees no error.

Harmon next asserts that the ALJ erred in his credibility assessment.

Again, this Court will not review the credibility determinations of the ALJ

unless the determinations lack any explanation or support in the record.

Elder, 529 F.3d at 413-14.  The ALJ cited support in the record for his credibility determination.  The ALJ noted Harmon's visit to Dr. Ayorinde's nurse practitioner Loleng in which he denied any fatigue, denied chest pain, anxiety, depression, gait disturbance, memory impairment, numbness in extremities, back pain, joint pain, and muscle weakness.  The ALJ noted other medical evidence that was inconsistent with Harmon's claims.  The ALJ recounted that Harmon was brought to the emergency room in 2011 claiming he took an overdose of Tylenol PM.  Lab work at the emergency room showed he had not actually taken an overdose of Tylenol and might be seeking attention.  R. 17.  The ALJ finally noted that Harmon testified that he thought he could work a job in which he could sit for six to eight hours a day.  R. 19-20.  All of this evidence supported the ALJ's credibility determination.  The Court, therefore, will not revisit the issue of credibility.

Harmon lastly states a two-sentence argument, "The ALJ determined that Plaintiff has not demonstrated that his obesity and pain would preclude sedentary work with restrictions.  This perfunctory dismissal of the effects of obesity without any accompanying rationally is grounds for remand."  Plaintiff's Memorandum, at 12.  This perfunctory argument is not developed, and therefore, waived.  Dunkel, 927 F.2d at 956.  The ALJ

further gave sufficient consideration to the effects of Harmon's obesity. See R. 13, 19.

THEREFORE THIS COURT RECOMMENDS that Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 13) should be ALLOWED, Plaintiff's Memorandum in Support of Summary Judgment or Remand (d/e 10) should be DENIED, and the decision of the Defendant Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:  February 23, 2016


_____s/ Tom Schanzle-Haskins_____
UNITED STATES MAGISTRATE JUDGE